[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a declaratory judgment action asking the court to determine that a lease had expired on July 31, 1998. The plaintiff is the current owner of the premises, Homer Scoville. The defendants are Shop-Rite Supermarkets, Inc. ("Shop-Rite"), the tenant; and two sub-lessees, F.P.T. Associates Leasing, LLC ("FPT") and Washington Middle Three, LLC.
The court makes the following findings of fact that have been proven by a preponderance of the evidence:
 1. The plaintiff purchased the premises — the Washington Plaza in Middletown, Connecticut — in the 1980's from its original owners. It was subject to the lease in question between the original owners and the defendant Shop-Rite's predecessor dated June 1, 1967.
 2. Shop-Rite operated the leased premises as a supermarket. The supermarket occupied twenty-five percent of the plaza and was an anchor tenant.
 3. The initial paragraphs of the lease provided that the lease term was for a period of twenty years. Section 5 provided for four options to extend for a period of five years each.
 4. Shop-Rite exercised its rights to extend in 1988 and 1993 under Sections 5(a) and 5(b) respectively. Section 5(b), properly executed, extended the term of the lease to July 31, 1998. Section 5(c) provides:
 If the tenant has exercised the foregoing privilege to extend the term and is otherwise rightfully in CT Page 6629 possession of the premises it may, by giving notice to the Landlord six (6) months or more before the last day of the extended term, further extend said term to and including the 31st day of July, 2003 upon the same covenants and agreements as are herein set forth.
 5. Section 30 sets forth how the notice of exercise of the extension was to be given:
 All notices to the Tenant shall be sent by telegram or registered or certified mail addressed to the Tenant at its business office at No. 69 Leggett Street, East Hartford, Conn., "Attention of the Secretary", or to such other person and at such other address as the Tenant shall hereafter designate by notice to the Landlord. All notices due the Landlord shall be sent by telegram or registered or certified mail addressed to the person to whom rent is payable at the address to which payments of rent may be sent, except that if the Tenant shall be in doubt as to whom payments should be made they may be addressed and sent to the person to whom rent was last paid at the address where such payment was directed. All notices of default to be effective must state the nature of the default.
 6. On June 21, 1994, the plaintiff notified Shop-Rite to send its rental payment to his attention at 500 Bald Eagle Drive, Naples, Florida. In December, 1997, Shop-Rite sent its rental payment to this address.
 7. After thirty years of operating the supermarket at the premises, in the fall of 1997, Shop-Rite decided to close the store due to poor financial results.
 8. The plaintiff recognized that Shop-Rite could assign its interest in the lease without restraint. He suggested, however, that Shop-Rite not assign the lease and he offered Shop-Rite $50,000 to buy out Shop-Rite's remaining interest in the lease. Shop-Rite understood that the plaintiff did not like the possibility of the lease being assigned. The attorney for Shop-Rite informed CT Page 6630 the plaintiff that Shop-Rite was attempting to reach an agreement with a sub-tenant before considering the plaintiff's offer. The plaintiff informed Shop-Rite that he did not want to have as a subtenant the person suggested by Shop-Rite for the subtenant.
 9. Since the "last day of the extended term" was July 31, 1998, the last day for exercise of the extension was January 31, 1998. Shop-Rite's attorney informed the plaintiff on January 15, 1998, that the negotiations with the sub-tenant were continuing and that Shop-Rite would either conclude an agreement soon with the sub-tenant, or not exercise its option under § 5(c) of the lease.
 10. The agreement with the sub-tenant, FPT, was concluded on January 28, 1998. (This assignment to FPT was again re-assigned to defendant Washington Middle Three).
 11. Shop-Rite sent notice of the exercise of the right given in § 5(c) as follows: 1. A certified letter of acceptance was sent to the plaintiff's home in Naples, Florida, on January 28, 1998; 2. A certified letter was sent to the plaintiff's Connecticut address in Niantic; 3. A certified letter was sent to the plaintiff's post office box in Glastonbury; 4. A UPS overnight letter was sent to Naples; 5. A UPS overnight letter was sent to Niantic; and 6. A UPS overnight letter was sent to the post office box.
 12. The certified letter to Naples arrived on Saturday, January 31, 1998. As the plaintiff was not at home, the mail carrier left him a notice which would allow him to obtain the letter. When the plaintiff found the notice in the mid-afternoon of the 31st the post office was closed. He retrieved the notice on Monday, February 2, 1998.
 13. The certified letter sent to the post office box in Niantic was forwarded to the plaintiff's home in Naples in February, 1998. CT Page 6631
 14. The certified letter to the post office box apparently was retrieved by the plaintiff at a date after February, 1998.
 15. The UPS overnight package to Naples was left on January 29, 1998, at the front door of the plaintiff, partially under a door mat. The plaintiff hardly ever uses this door, preferring to enter his home through a side door or through the garage. The package was discovered on February 2, 1998, when the plaintiff and a guest were moving luggage in through this door.
 16. The UPS overnight package to Niantic arrived there on January 29, 1998, but was not found by the plaintiff until after February, 1998, when he was visiting this property.
 17. The UPS overnight package to the post office box was refused and returned to Shop-Rite.
 18. While not required by § 30, Shop-Rite did not telephone or send a FAX to the plaintiff to alert him that the notice was coming.
 19. On receipt of the certified mail notice on February 2, 1998, the plaintiff wrote on February 5, 1998, to Shop-Rite rejecting the lease extension on the ground that the notice had arrived late under the terms of § 5(c).
 20. The lease in § 12 required that the plaintiff keep the premises "in good repair." In 1995, a dispute arose between the parties over whether the plaintiff was keeping the paved parking lot in good repair. After negotiations, the plaintiff and an official of Shop-Rite, Timothy J. Ring, agreed in writing that the plaintiff was not only to make further repairs to the parking lot, but was also to re-pave the lot. Shop-Rite agreed to make three payments towards the costs, one for $10,000 at the completion of the work, one on October 15, 1996, for $10,000, and one upon the "execution of the tenants renewal option" in 1998, in the amount of $5500. CT Page 6632
 21. The pavement project was completed by the plaintiff at a cost of $90,000. Shop-Rite made the first payment after it was notified by the plaintiff that the work was completed. The second payment was made after the plaintiff telephoned Shop-Rite, on its failure to pay on time.
 22. The third payment did not accompany the notice of extension. The plaintiff in his letter of February 5, 1998, also mentioned as a second reason for finding the extension invalid that the payment of $5500 was not included. Shop-Rite made a tender of the $5500 on July 31, 1998, but the plaintiff rejected this attempt and returned payment.
This action commenced with a complaint dated June 16, 1998, and subsequently an amended complaint dated July 14, 1998. The parties have raised the following issues in this matter:
 1. Whether the option to extend the lease was timely executed;
 2. Whether a modification of the lease occurred in resolution of the paving dispute and if so, whether the modification constituted a condition precedent to the exercise of the option;
 3. Whether equity should intervene to prevent a forfeiture of the lease.
The parties agreed by a stipulation approved by the court on March 20, 2001, that only the first two issues would be tried; if the court held for the plaintiff on both of the first two issues or for the defendant on the first issue, no further proceedings would take place and judgment would enter accordingly. If the court decided that the plaintiff should prevail on the first issue and the defendant on the second issue, then a further hearing would be scheduled to resolve issue three.
Accordingly, the court must consider first whether the exercise of the option was timely. The lease provides in § 5 that Shop-Rite must give "notice" to the plaintiff by January 31, 1998. Notice is accomplished by receipt by the officer, not merely the mailing of the acceptance. InSmith v. Hevro Realty Corp., 199 Conn. 330, 337 (1986) our Supreme Court stated this accepted rule:
CT Page 6633 In considering whether an offeree has exercised a right of acceptance in timely fashion, courts have fashioned rules that differ from those that govern acceptance of a revocable offer. Unless the parties have agreed to the contrary, acceptance under an option contract is not effective until it is actually received by the offeror.
Accord: Papagorgiou v. Anastasopoulos, Superior Court, judicial district of New Haven, Docket No. CV 87 02594959 (June 15, 1991, Schaller, J.);Cities Service Oil Co. v. National Shawmut Bank, 172 N.E.2d 104, 110
(Mass. 1961); Santos v. Dean, 982 P.2d 632 (Wash.App. Div. 3 1999), citing Restatement (Second) Contracts § 63(b) and 3 Eric Mills Holmes, Corbin on Contracts § 11.8, at 526 (1996 ed.).
The Dean court at 635 adopts the rationale of Romain v. A. HowardWholesale Co., 506 N.E.2d 1124, 1128 (Ind.Ct.App. 1987):
 Under an option contract then, the option holder has a firm and dependable basis for decision. His power of acceptance is absolute for the time agreed upon in the option contract. The option holder has no interests needing protection. He can act promptly and with confidence in reliance on the contract. There is thus no reason to extend the rule that acceptance is operative upon mailing since the option contract device itself fulfills the same purpose. To impose such a rule, where the parties have not expressly provided, would alter the agreement by binding the option giver longer than originally agreed and would inflict upon the option giver the risk of delay avoided by entering into the option contract. (emphasis in original).
Here § 5(c) of the lease is silent whether notice of acceptance of the option would be effective on mailing. Based § 30 of the lease, and the address to which the rent was last sent, the notice was to be given to the plaintiff at his Naples, Florida residence. Thus the notice of acceptance was effective only if the plaintiff had actually received it in Naples by January 31, 1998. This did not occur.
Two different attempts at notice were made by Shop-Rite. The first was a letter mailed certified on January 28, 1998. This letter was not left by the mail carrier on an attempted delivery on Saturday, January 31st, as the plaintiff was not at home. Instead the mail carrier left a slip, telling the plaintiff of the attempted delivery; this slip had to be CT Page 6634 turned in at the post office before the letter would be released to the plaintiff. The plaintiff received this slip at a time on January 31st
when his post office was closed. He obtained the letter and first became aware of its contents on February 2, 1998, the following Monday.
The second form of attempted delivery was the UPS overnight mail envelope. This package left New Jersey on January 28, 1998, but was placed on delivery on January 29th partially under a mat in an area of the house that the plaintiff did not normally enter. In addition the use of the UPS envelope was not included in § 30 of the lease as one of the acceptable methods for giving notice. Shop-Rite never telephoned the plaintiff between January 28 and January 31, 1998, to alert the plaintiff to the imminent arrival of either the certified letter or the UPS package. Its attorneys had a local office in Naples, but no one from that office either called or visited the plaintiff.[1]
Defendant FPT argues that § 5(c) of the lease calls for notice to the plaintiff, but does not specify that the plaintiff must receive the notice "in hand." FPT also refers to § 30 of the lease for the absence of the use of the word "received." Section 30 calls for notice by certified mail, registered mail or telegram. F.P.T's point was discussed in Crown Construction Company v. Huddleston, 961 S.W.2d 552 (Tex.App. 1997). There the court noted that "the certified mail requirement emphasizes the importance of confirmation of receipt of notice. Otherwise, delivery by regular mail would have been acceptable under the lease. The apparent purpose of certified mail, return receipt requested is to provide proof of delivery." Id. 556-7.
The leaving of the postal slip alone was insufficient to constitute the receipt of notice by January 31, 1998. The slip did not bring the election of the optionee "home to the optioner." NLRB v. Vapor RecoverySystems Co., 311 F.2d 782, 786 (9th Cir. 1962). Shop-Rite did not timely exercise its rights under § 5(c) of the lease. Computune,Inc. v. Tocio, 691 N.E.2d 994, 996 Mass. App. (1998) (a person seeking to exercise option rights must "turn his corners squarely.")
The defendants claim that the plaintiff has waived a timely response or is barred by equitable estoppel from claiming that the renew was not timely. In both 1988 and 1993, Shop-Rite mailed the acceptance of options under §§ 5(a) and (b) to the plaintiff at the same time as it did in 1998 for § 5(c), and nevertheless the options under the lease were considered by the plaintiff to have been timely exercised. The lease itself defeats this claim:
 Section 26. Waiver, etc. Failure of either party to complain of any act or omission on the part of the CT Page 6635 other party, no matter how long the same may continue, shall not be deemed to be a waiver by said party of any of its rights hereunder. No waiver by either party at any time, express or implied, of any breach of any provision of this Lease shall be deemed a waiver of a breach of any other provision of this Lease or a consent to any subsequent breach of the same or any other provision.
There were distinguishing facts surrounding the January 1998 notice and the earlier notices. As the court has found, in the fall of 1997, Shop-Rite closed its store and the space was vacant, the plaintiff had told Shop-Rite that it wanted the space back and had offered to purchase the lease, the plaintiff did not want the proposed sub-tenant of Shop-Rite to acquire the lease and had told Shop-Rite's general counsel, and the general counsel had told the plaintiff in mid-January, 1998, that he was having difficulties in finalizing an agreement with the sub-tenant. Equitable considerations must take into account changed circumstances. Commissioner of Environmental Protection v. ConnecticutBuilding Wrecking Co., 227 Conn. 175, 189, n. 12 (1993).
In Buckley Bros. Motors. v. Gran Prix Imports, 633 P.2d 1081 (Colo. 1981) the court found that the record did not support the lessee's argument that the lessor intended its excusal of non-compliance to be a waiver of future notice requirements; The lease in Buckley contained a non-waiver clause similar to the non-waiver clause in this case. The waiver and estoppel defenses fail because even if there were sufficient grounds for the plaintiff to object to the two prior notices, his failure to do so could not be deemed a waiver of the right to object to any subsequent notices. David A. Altschuler Trust v. Blanchette,33 Conn. App. 570, 572 (1994).
The second issue to be determined is whether, as claimed by the plaintiff, the failure of Shop-Rite to tender the sum of $5500 by January 31, 1998, constituted a breach of a condition precedent to exercising the lease option. The figure of $5500 is drawn from the Ring letter regarding the repavement project that this sum be paid "on the execution of the tenant's option" in 1998.
The plaintiff has failed to establish that the agreement amounted to a condition precedent.[2] A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. Christopherson v. Blount, 216 Conn. 509, 512 (1990), quotingLach v. Cahill, 138 Conn. 418, 421 (1951). If the condition does not take place, the right to enforce the contract does not come into existence.216 Conn. 512. Whether the performance of a certain act by a party to a CT Page 6636 contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument. Id; Ravitch v. Stollman Poultry Farms, Inc., 165 Conn. 135,149 (1973).
The plaintiff has not met this test. While he has stated that the payment was to operate as a condition precedent, there is no proof that Shop-Rite intended the provision to be satisfied before it could exercise its option of renewal. Shop-Rite intended that the payment provision be a confirmation that in the event it exercised its renewal option, it would also tender to the plaintiff the $5500.
The phrase "upon the execution of the tenant's renewal option" is elastic, not "lucid and unambiguous," as is required for a condition precedent. Brauer v. Freccia, 159 Conn. 289, 293 (1970). The word "upon" may mean "as soon as," "at the time of," or even "after" depending on the context. Sanford v. Luce, 60 N.W.2d 885 (Iowa, 1953). It could mean "before, after or simultaneously with," People v. Williams, 151 P.2d 224,246 (1944); or a reasonable time after an expiration date, Hays v.Arizona Corporation Commission, 409 P.2d 282 (Ariz. 1965). There is no indication of the need for "punctual performance" in the letter between Ring and the plaintiff. Brauer at 294. The court declines to find a condition precedent under these circumstances.
Based on the foregoing, the court's ruling is that Shop-Rite did not timely exercise its option under lease § 5(c), and that the payment of the $5500 did not constitute a condition precedent to its exercise. Therefore under the stipulated agreement, there must be a further hearing in this matter to consider the equities of the parties in the termination of the lease.[3] Before this occurs, however, the court believes that there should be a meeting of the parties with a judge of this court to attempt to resolve this lease controversy on agreeable terms. The court directs the parties to contact the court officer assigned to the Honorable Julia Aurigemma to schedule a meeting with the judge at her convenience. The court will retain jurisdiction in this matter in keeping with the parties' stipulation.
Henry S. Cohn, Judge