PACK 2000, INC. *v.* EUGENE C. CUSHMAN
(AC 30540)

Lavine, Beach and Lavery, Js.

---

Argued September 16, 2010—officially released February 1, 2011

*Andrew J. O'Keefe,* with whom, on the brief, was *Joseph M. Busher, Jr.,* for the appellant (defendant).

*Andrew Brand,* for the appellee (plaintiff).

### Opinion

LAVERY, J. The plaintiff, Pack 2000, Inc., brought these actions against the defendant, Eugene C. Cushman, seeking specific performance of two options to purchase realty that the plaintiff had leased from the defendant. After a trial to the court, the court rendered judgments in favor of the plaintiff. The defendant then filed this appeal, claiming that the court was required to apply a strict compliance standard in determining

whether the plaintiff had satisfied the conditions precedent to its exercise of the options and improperly determined that the plaintiff had retained its right to exercise the options.[1] We agree with the defendant and, accordingly, reverse the judgments of the trial court.

The following facts and procedural history are relevant to our resolution of the defendant's claim on appeal. In July, 2002, the plaintiff, the defendant and ARCO Corporation (ARCO),[2] a corporation controlled by the defendant, entered into a business transaction in which two Midas muffler shops (shops)[3] were to be transferred from ARCO to the plaintiff.[4] As part of the transaction, the parties executed a number of agreements, including two lease agreements, under which the defendant leased the realty where the shops are located to the plaintiff; a management agreement, under which the plaintiff assumed responsibility for the management and operation of the shops from ARCO; a letter of intent; and two promissory notes.

Each lease agreement contains a clause in paragraph 2 that provides the plaintiff with an option to purchase the leased realty subject to certain terms and conditions. The language of the two clauses is essentially

---

[1] The defendant also claims that (1) assuming that the doctrine of substantial performance applies to option contracts, the trial court improperly determined that the plaintiff had substantially complied with the terms and conditions of the options at issue and (2) that the court improperly determined that the plaintiff had demonstrated that it was able to perform by purchasing the defendant's realty. Because we reverse the judgments rendered in favor of the plaintiff due to its failure to comply strictly with the conditions precedent to its exercise of the options, we do not address these claims on appeal.

[2] ARCO was not a party to these actions and, accordingly, is not a party to this appeal.

[3] A third shop, located in Westerly, Rhode Island, was part of the transaction but is not at issue in this appeal.

[4] Two additional individuals, Kent H. Childs and M. Paulina Anderson, personally guaranteed the transaction. Neither of them, however, is a party to this appeal.

identical. Each clause provides in relevant part: "So long as [the plaintiff] has been in compliance with the terms and conditions of this Lease, the Letter of Intent, and Management Agreement . . . and is in compliance with such instruments when the option is exercised, [the plaintiff] shall have the option to purchase the real estate subject to this lease. . . . The option shall be exercised by [the plaintiff] giving [the defendant] three months advanced notice, in writing. The option may be exercised by giving the aforesaid notice between the date of this Lease [July 25, 2002] and the fifth anniversary of [the] same."

The management agreement also refers to the plaintiff's options to purchase the defendant's realty and contains the following language in paragraph 10 as it relates to the options: "The [plaintiff] shall be given an option to purchase the real estate upon which the shops are located. Said option shall be by separate agreement and signed by the titleholder and the party designated by [the plaintiff] to take title. Such option shall cite separate consideration and shall contain the terms as generally outlined herein. (a) Such option may be exercised between [the] date of commencement herein and the fifth anniversary of [the] same. . . . (f) [The plaintiff] must be in full compliance with this agreement and any lease agreement at the time of exercise."

In addition to the two lease agreements and the management agreement, the letter of intent also contains language that refers to the options. It provides in relevant part: "[The plaintiff] has the option to purchase from [the defendant] the buildings and the land housing the Shops, if this agreement and the . . . Management Agreement are executed. The option is for five years from the date of the Management Agreement. The price will be as appraised."

Under the terms of the two lease agreements, the management agreement and the promissory notes, the

plaintiff was required to make a number of periodic payments both to the defendant and to certain third parties in order to exercise the options. Specifically, the plaintiff was required to pay rent to the defendant by the first day of each month during the term of the lease, to make payments on both promissory notes by the eighth day of each month until the notes were fully paid and to pay all accounts, including, but not limited to, utilities, telephone service, real estate taxes, and hazard and liability insurance as well as an equipment lease.[5] At trial, the defendant testified that timely payment of the aforementioned accounts was vital and that he informed the plaintiff that untimely payments would jeopardize his franchise agreements with Midas and his mortgages on the two shops.[6]

Nevertheless, the record reveals that the plaintiff was often late in making the aforementioned payments. Specifically, the record reveals that the following payments were late: the rent payment due on May 1, 2004; three payments on the promissory notes due on February 8, 2003, and May 8 and June 8, 2006; one payment to Groton Utilities, which resulted in a shutoff notice that the defendant forwarded to the plaintiff on January 23, 2003; several payments to a telephone company, which resulted in several collection letters and telephone calls that the defendant received in late 2002 and early 2003 as well as a threat to terminate telephone service to the defendant's unrelated business in March, 2003; two real estate tax installments on the New London shop due January 1, 2005, and January 1, 2007; one real estate tax installment on the Groton shop due July 1, 2007;

---

[5] The leased equipment for automobile emissions testing was located in the Westerly, Rhode Island shop. Although the ownership of that shop is not in dispute in the present case, the timely payment of the equipment lease was required by the management agreement, which applied to all three shops.

[6] The defendant also testified that timely payment was "the only consideration [that he received] for giving [the plaintiff] the option[s] . . . ."

twelve hazard and liability insurance installments between November, 2002, and January, 2004, that resulted in cancellation notices issued on July 30, 2003, and November 29, 2004; twenty health insurance installments between October, 2002, and September, 2005; and several installments under the terms of an equipment lease that resulted in several collection calls to the defendant in 2002 and 2003.

On August 22, 2003, the plaintiff's vice president, M. Paulina Anderson, faxed a letter to the defendant in which she stated that she wanted "to finalize the purchase of the shops and exercise the option[s] to purchase the real estate by the end of 2003." On August 29, 2003, Anderson sent a second letter to the defendant in which she sought information about a possible appraisal and indicated that Banterra Bank (bank) could not commit to financing the purchase until it had ascertained the value of the defendant's realty.

On September 2, 2003, the defendant, on behalf of ARCO, sent a letter to Anderson in which he stated that the plaintiff was not in compliance with the terms and conditions of the management agreement. Specifically, the letter stated: "The installment payment regarding the . . . Management Agreement which was due September 1, 2003 has not been received. Per the provisions of said agreement, the monthly installments are due on the first day of each month. Your monthly payments have been consistently late and have required telephone calls from [ARCO] nearly every month in order to prompt the payment. Timely payment of the note was and is a material condition of the agreement. As you have known from the inception, ARCO . . . is dependent upon timely payments from you in order to remain in compliance with its obligations concerning various mortgages. Your late payment for August put ARCO . . . in default with one of its mortgagees. This is an intolerable circumstance. You are hereby put on notice

that this late payment, and all of the prior late payments, and any future late payments puts you out of compliance with the terms and conditions of the Management Agreement. Subsequent acceptance of the September, 2003 payment (or any future payment tendered after the date due) will not cure the non-compliance, nor does ARCO . . . waive any rights or consequences which flow from your non-compliance." There is no record of the plaintiff having specifically responded to this letter.

On May 16 and 19, 2006, the plaintiff again sought to exercise the options to purchase the defendant's realty. At that time, however, the payment on one of the promissory notes that was due on May 8, 2006, had not been paid.

On July 17, 2006, the plaintiff commenced these actions against the defendant claiming that it was entitled to specific performance of the options to purchase the defendant's realty. In its disclosure of defense, filed on August 4, 2006, the defendant argued that the plaintiff's claim was without merit because, among other things, the plaintiff had not complied with the terms of one of the promissory notes and the conditions of the lease at the time of its attempt to exercise the options, and, therefore, the options had been forfeited or terminated by the plaintiff's fault or noncompliance. As of the date of trial, the plaintiff had paid the defendant in excess of $600,000 in rent under the terms of the lease agreements, $700,000 under the terms of the promissory notes and was not in arrears on its financial obligations under the terms of any of the aforementioned agreements.

On August 11, 2008, the trial court rendered judgments in favor of the plaintiff. The court determined that the plaintiff had retained the right to exercise the options because it had substantially complied with the

terms and conditions of the options. The court also determined that the plaintiff had effectively exercised the options on August 22, 2003, and was entitled to specific performance. The court, therefore, ordered the defendant to sell the realty at issue to the plaintiff under the terms of their agreements. On August 28, 2008, the defendant filed a motion to open the judgments and for reconsideration, which the court denied on November 5, 2008. This appeal followed.

On appeal, the defendant claims that the court applied an improper standard in finding that the plaintiff had complied with the conditions precedent to its exercise of the options and improperly determined that the plaintiff had retained its right to exercise the options. Specifically, the defendant contends that the plaintiff could have maintained its right to exercise the options only by *strict* compliance with the conditions precedent to its exercise of the options and that the plaintiff had lost its right to exercise the options because it had failed to satisfy this strict compliance standard. We agree.

We begin by setting forth the applicable standards of review. The defendant's appeal challenges the validity of the trial court's judgments with respect to its fact-finding and legal conclusions. "Our basic standard of review of such claims is well established. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 344, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002). Our standard of review when the court has granted or denied the remedy of specific performance of a contract to sell land is abuse

of discretion because specific performance "is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light of the settled principles of equity." (Internal quotation marks omitted.) *Hill* v. *Raffone*, 103 Conn. App. 737, 742, 930 A.2d 788 (2007).

Our Supreme Court has determined, albeit implicitly, that when a lease provides the lessee with the option to purchase realty subject to certain terms and conditions, the right of the lessee to exercise the option is contingent on the lessee's strict compliance with those terms and conditions. See *Brauer* v. *Freccia*, 159 Conn. 289, 268 A.2d 645 (1970). The facts in *Brauer* are similar to the facts in the present case. In *Brauer,* the plaintiffs and the defendants entered into a lease that provided the plaintiffs with an option to purchase the defendants' property on the condition that, among other things, the plaintiffs pay rent to the defendants by the first day of each month during the term of the lease. Id., 291 n.1. At the time that the plaintiffs attempted to exercise their option, they had failed to make a number of the required rent payments. Id., 292. It was on that basis that the defendants refused to convey their property to the plaintiffs. Id. Our Supreme Court ruled in favor of the defendants and found that the language of the lease "clearly indicate[d] that the defendants' duty to comply with the terms of the option was conditioned upon the plaintiffs' punctual performance of their obligations under the lease."[7] Id., 293–94. The court further determined that "[a] tenant who fails to meet the named conditions of his lease defeats his right to rely on it when he makes an effort to purchase the property pursuant to

---

[7] The lease at issue in *Brauer* provided in relevant part that "IT IS FURTHER MUTUALLY AGREED THAT if the Lessees shall have duly and punctually fulfilled all of the provisions, agreements, covenants and conditions of this lease . . . the Lessor . . . will convey the leased premises to the lessees . . . ." (Internal quotation marks omitted.) *Brauer* v. *Freccia*, supra, 159 Conn. 291 n.1.

the option in the lease. *Lake Shore Country Club* v. *Brand*, 339 Ill. 504, 522, 171 N.E. 494 [1930]." *Brauer* v. *Freccia*, supra, 294. The court concluded, therefore, that "since the plaintiffs had failed to perform their obligations under the lease, the right to enforce the option to purchase was not in existence and the defendants were under no obligation to convey the property." Id.

A review of *Lake Shore Country Club*, which our Supreme Court cited in *Brauer*, is instructive. In *Lake Shore Country Club*, the Supreme Court of Illinois found that the lessee had failed to comply with a number of the conditions of an option to purchase real property. The lessors, citing the lessee's noncompliance, refused to convey their property to the lessee. *Lake Shore Country Club* v. *Brand*, supra, 339 Ill. 512. The court, in rendering its decision in favor of the lessors, determined that because an option contract is unilateral, and "[b]ecause but one party is bound thereby and the other is not, courts will exercise their discretion with great care in determining whether such a unilateral contract has been converted into a bilateral contract." (Citation omitted.) Id., 521. "[U]nless the [lessee] has met the conditions of the option contract or the conditions have been waived, it is not entitled to exercise the option." Id., 522. In subsequent decisions, Illinois courts have interpreted the *Lake Shore Country Club* decision as requiring that a party must comply strictly with the conditions precedent to its right to exercise an option. See, e.g., *Epton* v. *CBC Corp.*, 48 Ill. App. 2d 274, 284–85, 197 N.E.2d 727 (1964).

On appeal, the plaintiff claims that the court properly applied the doctrine of substantial compliance in determining that it had retained the right to exercise the options at issue. The plaintiff correctly asserts that the "general rule with respect to compliance with contract terms . . . is not one of strict compliance, but

substantial compliance." (Internal quotation marks omitted.) *Borelli* v. *H & H Contracting, Inc.*, 100 Conn. App. 680, 692 n.6, 919 A.2d 500 (2007), appeal dismissed, 285 Conn. 553, 940 A.2d 787 (2008), quoting 15 S. Williston, Contracts (4th Ed. Lord 2000) § 44:52, pp. 217–18. The doctrine of substantial compliance is closely intertwined with the doctrine of substantial performance. "The doctrine of substantial performance shields contracting parties from the harsh effects of being held to the letter of their agreements. Pursuant to the doctrine of substantial performance, a technical breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is immaterial." (Internal quotation marks omitted.) *Borelli* v. *H & H Contracting, Inc.*, supra, 692 n.6, quoting 15 S. Williston, supra, § 44:52, pp. 221–22.

While the doctrine of substantial compliance is the general rule with respect to bilateral contracts, it is not the general rule with respect to options. An option, unlike a bilateral contract to buy and sell real estate, is unilateral in nature. See 15 S. Williston, supra, § 44:52, pp. 217–20. "The distinction . . . is that the contract to purchase and sell creates a mutual obligation on the one party to sell and on the other to purchase, while an option merely gives the right to purchase within a limited time without imposing any obligation to purchase." (Internal quotation marks omitted.) *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 815–16, 3 A.3d 992 (2010).

In light of our Supreme Court's decision in *Brauer*, we conclude that a party retains its right to exercise an option to purchase realty only by strict compliance with the conditions precedent to its exercise of the option. We also find it persuasive that strict compliance is now the rule in many American jurisdictions. See,

e.g., *Pear* v. *Davenport*, 67 Mass. App. 239, 244–45, 853 N.E.2d 206 (2006); *Le Baron Homes, Inc.* v. *Pontiac Housing Fund, Inc.*, 319 Mich. 310, 315, 29 N.W.2d 704 (1947); *Raanan* v. *Tom's Triangle, Inc.*, 303 App. Div. 2d 668, 669, 758 N.Y.S.2d 343 (2003); *Zeidman* v. *Davis*, 161 Tex. 496, 499, 342 S.W.2d 555 (1961); *Buchannon* v. *Billings*, 127 Vt. 69, 74–75, 238 A.2d 638 (1968); see also 77A Am. Jur. 2d 158, Vendor and Purchaser § 40 (2006); 92 C.J.S. 144–45, Vendor and Purchaser § 171 (2010); 25 S. Williston, Contracts (4th Ed. Lord 2002) § 67:84, pp. 499–502.

The defendant claims that the plaintiff has lost its right to exercise the options at issue because it has not strictly complied with the conditions precedent to the defendant's duty to perform. "A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in the light of the circumstances surrounding the execution of the instrument." (Citation omitted; internal quotation marks omitted.) *Brauer* v. *Freccia*, supra, 159 Conn. 293.

In the present case, the two lease agreements provide that the defendant's duty to perform under the terms of the options is conditioned on the plaintiff's "compliance with the terms and conditions of [the] Lease, the Letter of Intent, and Management Agreement . . . ." Additionally, the management agreement provides that the plaintiff must be in "full compliance with [the management agreement]" in order to exercise the options to purchase the defendant's realty. Under the terms of these agreements, the plaintiff is required to make periodic payments to the defendant and to certain third parties by specified deadlines. We conclude, therefore,

that the plaintiff's right to exercise the options is subject to a condition precedent—namely, the timely submission of the aforementioned payments.

Upon our review of the record, we find ample support for the court's finding that the plaintiff was often late in making the required payments. Accordingly, we agree with the court's conclusion that the plaintiff did not strictly comply with the terms and conditions of its agreements with the defendant. We conclude, therefore, that the plaintiff did not have the right to exercise the options to purchase the defendant's realty because the plaintiff was not in strict compliance with the contracts that set forth the terms of the options.

The judgments are reversed and the cases are remanded with direction to render judgments for the defendant.

In this opinion the other judges concurred.